# Exhibit A

FILED

17 NOV 29 PM 3:15

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 17-2-30700-9 SEA

1    DOMINIC M. CARUCCI (State Bar No. 45568)
     Kushner Carlson
2    A Professional Law Corporation
     85 Enterprise, Suite 310
3    Aliso Viejo, CA  92656
     Telephone: (949) 421-3030
4    Telecopier: (949) 421-3031

5    Attorney for Plaintiff

6

7

8                THE SUPERIOR COURT OF THE STATE OF WASHINGTON

9                                COUNTY OF KING

10

11   STUC-O-FLEX INTERNATIONAL, INC., a        Case No.:
     Washington corporation,
12                                             **COMPLAINT FOR:**
                Plaintiff,
13                                             **(1)    BREACH OF CONTRACT;**
                                               **(2)    TORTIOUS INTERFERENCE WITH**
14         vs.                                 **       BUSINESS EXPECTANCY;**
                                               **(3)    TRADE NAME INFRINGEMENT;**
15                                             **       AND**
     LOW AND BONAR, INC., a Delaware           **(4)    VIOLATION OF CONSUMER**
16   corporation; WALFLOR INDUSTRIES, INC., a  **       PROTECTION ACT**
     Washington corporation; WATERWAY
17   RAINSCREEN, LLC, a Washington limited
     liability company; JOHN URAL, an individual;
18   MIKE CZERWINSKI, an individual; JIM
     HEWITT, an individual; and DOES 1-20,
19   inclusive,

20              Defendants.

21

22         Plaintiff Stuc-O-Flex International, Inc. ("Stuc-O-Flex") hereby alleges as follows:

23                                   **PARTIES**

24         1.    Stuc-O-Flex is a corporation organized and existing under the laws of the State of

25   Washington.  At all relevant times, Stuc-O-Flex has been doing business in the State of Washington,

26   County of King.

27

28

                                        1
                                     COMPLAINT

2.     Defendant Low & Bonar, Inc. ("L&B"), is a corporation organized and existing under the laws of the State of Delaware.  At all relevant times, L&B has been doing business in the State of Washington, County of King.

3.     Defendant Walflor Industries, Inc. ("Walflor"), is a corporation organized and existing under the laws of the State of Washington.  At all relevant times, Walflor has been doing business in the State of Washington, County of King.  Walflor is also owned and operated by L&B as of January 17, 2017, the date of L&B's purchase of Walflor.

4.     Defendant Waterway Rainscreen, LLC ("WR"), is a corporation organized and existing under the laws of the State of Washington.  At all relevant times, WR was been doing business in the State of Washington, County of King, until Walflor's purchase of WR's assets and liabilities in or around January of 2016, at which time WR became defunct and discontinued doing business.  WR's assets and liabilities are now owned by Walflor and by L&B, as of January of 2017, the date of L&B's purchase of Walflor, and Walflor as of January of 2016, the date of Walflor's purchase of WR's assets and liabilities.

5.     L&B, Walflor, and WR may be collectively referred to as the "Manufacturing Defendants."

6.     Defendant John Ural ("Ural") is an individual and a resident of the State of Washington.  At all relevant times, Ural was the owner of WR, and, upon information and belief, subsequently became a principal of Walflor and ultimately an employee of L&B.

7.     Defendant Mike Czerwinski ("Czerwinski") is an individual and, upon information and belief, a resident of the State of Washington.  At all relevant times, Czerwinski was a principal of Walflor and, upon information and belief, ultimately an employee of L&B in his capacity as an owner and operator of Walflor.

8.     Defendant Jim Hewitt ("Hewitt") is an individual and, upon information and belief, a resident of the State of Washington.  At all relevant times, Hewitt was a principal of Walflor and, upon information and belief, ultimately an employee of L&B in his capacity as an owner and operator of Walflor.

9.      Ural, Czerwinski, and Hewitt may be collectively referred to as the "Individual Defendants."

10.     Stuc-O-Flex contends that Ural, Czerwinski, Hewitt, and Walflor are the alter egos of each other, and for all intents and purposes, are one in the same. Stuc-O-Flex also contends that Ural and WR are the alter egos of each other, and for all intents and purposes, are one in the same. At all relevant times, there existed a unity of interest, ownership, and control between these parties such that any separateness between them has ceased to exist. Stuc-O-Flex further contends that a failure by the Court to recognize this unity of interest would constitute a fraud upon the Court and result in manifest injustice.

11.     Stuc-O-Flex further alleges that when L&B acquired Walflor, L&B also acquired the company's ongoing obligations and liability originating from Walflor and WR, including the obligations and liability originating from the below-defined Exclusivity Agreement. This is because L&B kept Walflor's business entirely intact, including the same manufacturing plant, operations, customers, employees, and principal operators of the business (i.e., the Individual Defendants), as described more particularly below. L&B was also on notice of the below-defined Exclusivity Agreement at the time it acquired Walflor, and L&B has continued to invoice Stuc-O-Flex with the same method, pricing, and other conditions detailed in the Exclusivity Agreement and as Walflor and its predecessor, WR, had done.

12.     Similarly, Walflor had also originally acquired the ongoing obligations and liability originating from the below-defined Exclusivity Agreement for the same reasons. Walflor, too, kept WR's business entirely intact after its acquisition of WR's assets and liabilities, including the same manufacturing plant, operations, customers, employees, and principal operators of the business (i.e., the Individual Defendants), as described more particularly below. Walflor was also on notice of the below-defined Exclusivity Agreement at the time it acquired WR's assets, and Walflor continued to invoice Stuc-O-Flex with the same method, pricing, and other conditions detailed in the Exclusivity Agreement and as its predecessor, WR, had done.

3

COMPLAINT

13.      Stuc-O-Flex alleges upon information and belief that at all relevant times each named and unnamed defendant was the agent and/or employee of the other co-defendants, and at all times each defendant was and is acting within the purpose and scope of such agency and/or employment and with the permission and consent of his/her/its co-defendants with knowledge, authorization, permission, consent, and/or subsequent ratification and approval of each co-defendant.  Stuc-O-Flex is further informed and believes that each named and unnamed defendant knowingly and willfully conspired and agreed amongst themselves to deprive Stuc-O-Flex of its rights and to cause the damages described below.

14.      Stuc-O-Flex is ignorant of the true names of the defendants sued herein as DOES 1 through 20 inclusive, and therefore it sues those defendants under such fictitious names.  Stuc-O-Flex alleges upon information and belief that each of the fictitiously named defendants is responsible in some manner for the actions or inactions alleged below.  Stuc-O-Flex will amend this Complaint when the true identities of any DOES are ascertained.

15.      L&B, Walflor, WR, Hewitt, Czerwinski, Ural, and DOES 1 through 20 may be referred to collectively as "Defendants."

## BACKGROUND ALLEGATIONS

16.      Stuc-O-Flex is an established distributor of WaterWay Rainscreen and Ventilation Mats designed for use with commercial building foundation and vertical wall material (e.g., stucco, stone, etc.) to prevent water accumulation (the "Products").  From 2005-2007, Stuc-O-Flex invested significantly in the manufacture and production of the Products, and in July of 2007 filed for a corresponding patent with the United States Patent and Trademark Office ("USPTO").

17.      On October 5, 2010, the USPTO duly and lawfully issued United States Patent No. 7,807,011 B2 (the "'011 Patent"), entitled "Multilayer Laminate System and Method Used Within Building Structures."  Stuc-O-Flex is the owner by assignment of all right, title and interest in the '011 Patent.  (A true copy of the '011 Patent is attached as **Exhibit "A."**)

18.      Around this same time, Stuc-O-Flex's principals, Richard Dunstan ("Dunstan") and Daniel Johnson ("Johnson"), explored options for their acquaintance, Ural, to manufacture the

1  Products for Stuc-O-Flex's distribution in the United States and Canada.  Stuc-O-Flex completely

2  supported Ural and his new company, WR, in the creation of his business and manufacturing plant in

3  Monroe, Washington.  When Ural and WR began, WR had no source of income and no business

4  structure whatsoever.

5        19.     It took about two years for WR to become a functional enterprise.  Then, in October of

6  2012, WR generated its first sellable production of the Products.  For nearly a year, Stuc-O-Flex

7  assisted WR with manufacturing the Products, paid early to ensure WR's business profitability,

8  marketed to and recruited distribution and end-user customers in the United States and Canada, and

9  designed and certified the quality materials that make the Products first-rate.

10                **Stuc-O-Flex and WR Enter into the Exclusivity Agreement**

11        20.     On May 29, 2013, Stuc-O-Flex and WR entered into the Exclusivity Agreement (the

12  "Exclusivity Agreement").  (A true copy of the Exclusivity Agreement is attached as **Exhibit "B."**)

13  Under the Exclusivity Agreement, WR was obligated to adhere to the following terms:

14        20.1.   Manufacture the Products only for Stuc-O-Flex's exclusive distribution in the
           United States and Canada;

15        20.2.   In the event that any Stuc-O-Flex competitor has interest in purchasing the
16         Products, WR may sell to them only upon written consent and royalty compensation of
           $0.02 per square foot to Stuc-O-Flex;
17
        20.3.   Sell the manufactured Products to Stuc-O-Flex under the pricing schedule in
18         detailed in paragraph 4;

19        20.4.   Take only such actions that enhance Stuc-O-Flex's reputation and only produce
           the Products in a quality consented to by Stuc-O-Flex;
20
        20.5.   Use Stuc-O-Flex's logo and trade names (e.g., "SFI" and "WaterWay
21         Rainscreen") (the "Trade Names") and graphic design only in the manner described in
           paragraph 12;
22
        20.6.   Not compete with Stuc-O-Flex in sale of the Products; and
23
        20.7.   Allow for inspection of all Products by Stuc-O-Flex prior to distribution, with an
24         option to replace the Products should they be deemed defective.

25        21.     In addition, the Exclusivity Agreement called for WR to not repackage, use, or combine

26  the Products with any other goods and/or to sell the Products without Stuc-O-Flex's express written

27  consent.  Because of this, and due to the exclusive arrangement and distributorship of Stuc-O-Flex in

28

1  the United States and Canada, Stuc-O-Flex did not pursue WR (or any other subsequent business as

2  discussed below) for infringement of the '011 Patent for production and/or sale of the Products.

3          22.      For two-and-a-half years, WR manufactured the Products for Stuc-O-Flex's distribution

4  in the United States and Canada.  WR invoiced Stuc-O-Flex pursuant to the pricing schedule detailed

5  in paragraph 4 of the Exclusivity Agreement, and Stuc-O-Flex issued purchase orders to WR for the

6  Products.  WR also marked the Products with Stuc-O-Flex's Trade Names, which are well-known in

7  the industry and intimately associated with Stuc-O-Flex and its brand.  For potential customers,

8  Dunstan, Johnson, and Ural would tour WR's manufacturing plant in Monroe, Washington to exhibit

9  the Products.

10  **Walflor Obtains WR's Assets, Assumes Obligations Under the Exclusivity Agreement, and**

11  **Begins Wrongfully Competing with Stuc-O-Flex**

12          23.      In January of 2016, Stuc-O-Flex received notice that Ural and his associates,

13  Czerwinski and Hewitt, were merging into a separate company, Walflor.  Stuc-O-Flex is informed and

14  believes that Walflor acquired all of WR's assets in this merger.  Stuc-O-Flex was informed by

15  Walflor that it should send all subsequent purchase orders for the Products, and that Walflor would

16  adhere to the terms of the Exclusivity Agreement.  Stuc-O-Flex then began receiving invoices and

17  Products from Walflor and distributing them throughout the United States and Canada, and Walflor

18  performed under the Exclusivity Agreement with respect to pricing, Trade Names, and other terms.

19          24.      At this time, Walflor created an additional manufacturing plant in Burlington,

20  Washington.  The Burlington-based plant was (and still is) a clone of the Monroe-based plant.  Indeed,

21  Walflor largely kept the same exact and highly specialized equipment, manufactured the same

22  Products with specifications pursuant to prior dealings between Stuc-O-Flex and WR, and distributed

23  the marked Products to Stuc-O-Flex in the same manner as WR from both plants.  And, Walflor

24  employed Ural to work in the plant with Hewitt and Czerwinski.

25          25.      In July of 2016, Stuc-O-Flex discovered that Walflor had been selling the Stuc-O-Flex-

26  marked Products to a Stuc-O-Flex customer in the United States and Canada.  When confronted,

27  Walflor's principal, Hewitt, tacitly acknowledged the contractual breach of the Exclusivity Agreement,

28

1  indicated that he would comply with the Exclusivity Agreement's provisions to seek approval from

2  Stuc-O-Flex prior to selling any Products to customers or competitors, and hoped that there were "no

3  hard feelings."

4       26.    Stuc-O-Flex then learned that Walflor and WR's wrongful conduct extended further

5  than just a single customer.  Indeed, in 2016 and 2017, Stuc-O-Flex has since uncovered evidence that

6  Walflor and WR sold the Stuc-O-Flex Trade-Name-marked Products to multiple parties in the United

7  States and Canada for years in violation of the Exclusivity Agreement and without Stuc-O-Flex's

8  consent, resulting in several millions of dollars in lost profits.

9  **L&B Purchases Walflor, Manufactures and Sells the Products, and Denies the Exclusivity**

10  **Arrangement**

11       27.    Toward the end of 2016 and into 2017, Stuc-O-Flex alleges that Walflor sought a buyer

12  to purchase the company in the hopes that this increasing liability may be absolved or mitigated.  On

13  January 17, 2017, L&B acquired Walflor's assets and began manufacturing the Products for

14  distribution throughout the United States and Canada in the same manner as Walflor, without

15  acknowledging any exclusivity arrangement with Stuc-O-Flex.

16       28.    L&B hired all of the Individual Defendants as employees to continue the operation of

17  Walflor's exact same manufacturing facility in Burlington, Washington.  L&B than began invoicing

18  Stuc-O-Flex in the same manner as Walflor and WR, attempting to continue business as usual.  L&B

19  invoiced Stuc-O-Flex with the same pricing schedule as in paragraph 4 of the Exclusivity Agreement,

20  and Stuc-O-Flex was directed to send purchase orders to L&B in the same manner.  L&B even sold the

21  Products marked with Stuc-O-Flex's distinct Trade Names.

22       29.    During this transition, L&B repeatedly attempted to side-step liability or any obligations

23  under the Exclusivity Agreement, while also appearing keenly aware of its exposure.  On February 22,

24  2017, L&B, through its principal, Clark Halladay ("Halladay"), requested that Stuc-O-Flex "agree to

25  pursue any legal or business claims against [Ural] or [WR] separate to the ongoing business

26  relationship with [Walflor] or [L&B]."  Halladay did this even though WR was no longer a functional

27  entity and Ural worked for Walflor and L&B.

28

30.     L&B, through Halladay, also appeared to pressure Stuc-O-Flex by holding the distribution of its marked Products hostage.  Indeed, Halladay demanded that "the outstanding [WR] invoices be paid in full while [Stuc-O-Flex's] dispute with [Ural] and [WR] be resolved separately." And, in a correspondence dated February 28, 2017, Halladay again asked that Stuc-O-Flex "agree to pursue and legal or business claims against [Ural] or [WR] separately, without endangering the ongoing business relationship with [Walflor] or [L&B]."

31.     To make matters worse, L&B and Walflor, upon information and belief, were at the same time blatantly violating the terms of the Exclusivity Agreement, and in particular the provisions relating to Stuc-O-Flex's exclusivity arrangement in the United States and Canada, by selling the marked Products directly to its competitors without Stuc-O-Flex's consent.  Stuc-O-Flex also alleges that L&B ordered Ural to try to terminate the Exclusivity Agreement, which he attempted in writing only days after L&B acquired Walflor, even though he had no legal authority to do so.[1]

32.     Furthermore, Stuc-O-Flex alleges upon information and belief that L&B has, in breach of the Exclusivity Agreement, allowed the quality of the manufactured Products to deteriorate.  L&B has required that Walflor cut costs at the Burlington-based plant and use lower quality materials in production, without seeking Stuc-O-Flex's approval.  Stuc-O-Flex alleges that this not only affects public consumers of the Products negatively, but also reflects negatively on Stuc-O-Flex's reputation. This is especially so given that the Products were still marked with Stuc-O-Flex's Trade Names.

33.     For the past year, Stuc-O-Flex has endeavored to informally deal with these issues while still maintaining a business relationship with L&B.  L&B, through Halladay, has stymied every such effort[2] and has continued to knowingly violate the Exclusivity Agreement by selling lower-quality marked Products to Stuc-O-Flex's customers from Walflor's Burlington-based manufacturing plant without Stuc-O-Flex's consent.  This has left Stuc-O-Flex without recourse and has forced the

---

[1] Ural attempted to terminate the Exclusivity Agreement on behalf of WR after L&B acquired Walflor, even though WR was no longer the supplier under the Exclusivity Agreement due to WR's asset-acquisition by Walflor, as well as Walflor's subsequent manufacture of the Products and adherence to the terms of the Exclusivity Agreement as described above.

[2] As recently as November of 2017, Halladay forced a material delay of the delivery of two Stuc-O-Flex orders of the Products to create leverage, and he even threated to reconsider any further supply by Walflor of the Products should Stuc-O-Flex file the instant lawsuit to protect its rights.

COMPLAINT

1  company to bring the above-captioned litigation to protect its rights, as well as the rights of the public

2  consumer.

3    34.    In addition, Stuc-O-Flex expressly reserves its rights to move forward with a Patent

4  Infringement claim against the Manufacturing Defendants under 35 U.S.C. § 271.  Stuc-O-Flex will

5  pursue the remedies for Patent Infringement only if the Court or other trier of fact finds that the

6  Exclusivity Agreement does not apply to the Manufacturing Defendants.  In that case, Stuc-O-Flex

7  would not have any exclusive rights to distribute the Products, and thus would have reason to enforce

8  its '011 Patent to protect its rights.

9  **FIRST CAUSE OF ACTION**

10  **(For Breach of Contract Against the Manufacturing Defendants)**

11    35.    Stuc-O-Flex repeats and incorporates by reference into this cause of action the

12  allegations set forth above as though fully set forth in this cause of action.

13    36.    As referenced above, on May 29, 2013, Stuc-O-Flex and WR originally entered into the

14  Exclusivity Agreement.  Under the Exclusivity Agreement, WR was obligated to adhere to the

15  following terms:

16    36.1.    Manufacture the Products only for Stuc-O-Flex's exclusive distribution,
17  marketing, and sale in the United States and Canada;

18    36.2.    In the event that any Stuc-O-Flex competitor has interest in purchasing the
   Products, WR may sell to them only upon written consent and compensation of $0.02
19  per square foot to Stuc-O-Flex;

20    36.3.    Sell the manufactured Products to Stuc-O-Flex under the pricing schedule in
   detailed in paragraph 4;

21    36.4.    Take only such actions that enhance Stuc-O-Flex's reputation and only produce
22  the Products in a quality consented to by Stuc-O-Flex;

23    36.5.    Use Stuc-O-Flex's Trade Names only in the manner described in paragraph 12;

24    36.6.    Not compete with Stuc-O-Flex in sale of the Products; and

25    36.7.    Allow for inspection of all Products by Stuc-O-Flex prior to distribution, with an
   option to replace the Products should they be deemed defective.

26    37.    In addition, the Exclusivity Agreement called for WR to not repackage, use, or combine

27  the Products with any other goods and/or to sell the Products without Stuc-O-Flex's express written

28

9
COMPLAINT

1  consent.  Because of this, and due to the exclusive arrangement and distributorship of Stuc-O-Flex in

2  the United States and Canada, Stuc-O-Flex did not pursue WR (or any other subsequent purchasing

3  Manufacturing Defendant) for infringement of the '011 Patent for production and/or sale of the

4  Products.

5     38.     Stuc-O-Flex alleges that the obligations under the Exclusivity Agreement inured to the

6  other Manufacturing Defendants, and specifically Walflor and L&B, for the reasons outlined in detail

7  above.  Indeed, L&B acquired Walflor, and L&B also acquired its ongoing obligations and liability

8  originating from Walflor and WR, including the obligations and liability originating from the

9  Exclusivity Agreement.  This is because L&B kept Walflor's business entirely intact, including the

10  same manufacturing plant, operations, customers, employees, and principal operators of the business

11  (i.e., the Individual Defendants), as described above.  L&B was also on notice of the Exclusivity

12  Agreement at the time it acquired Walflor, and L&B has continued to invoice Stuc-O-Flex with the

13  same method, pricing, and other conditions detailed in the Exclusivity Agreement and as Walflor and

14  its predecessor, WR, had done.

15     39.     Similarly, Walflor had also originally acquired the ongoing obligations and liability

16  originating from the Exclusivity Agreement for the same reasons.  Walflor, too, kept WR's business

17  entirely intact after its acquisition of WR's assets, including the same manufacturing plant, operations,

18  customers, employees, and principal operators of the business (i.e., the Individual Defendants), as

19  described above.  Walflor was also on notice of the below-defined Exclusivity Agreement at the time it

20  acquired WR's assets, and Walflor continued to invoice Stuc-O-Flex with the same method, pricing,

21  and other conditions detailed in the Exclusivity Agreement and as its predecessor, WR, had done.

22     40.     In addition, paragraph 7 of the Exclusivity Agreement further indicates that in the event

23  the supplier under the Exclusivity Agreement (i.e., WR, and subsequently, Walflor) sells its company,

24  the Exclusivity Agreement "will remain in effect and [the] purchasing party will be bound by the terms

25  set forth in the [Exclusivity Agreement]."  As a result, the Manufacturing Defendants are also

26  contractually bound, in addition to legally bound under Washington law, to assume performance of the

27  obligations under the Exclusivity Agreement.

28

41.     Stuc-O-Flex performed each and every obligation owed by it under the Exclusivity Agreement as detailed above, except those that it was prevented from performing due to the Manufacturing Defendants' wrongful conduct.  Stuc-O-Flex further desires to complete performance under the Exclusivity Agreement, as the specially manufactured Products are to be distributed solely through Stuc-O-Flex in the United States and Canada under the exclusivity arrangement, as well as pursuant to Stuc-O-Flex's consent, inspection of the Products, and other terms.

42.     In acting or failing to act as described above, Stuc-O-Flex alleges that the Manufacturing Defendants breached the material terms of the Exclusivity Agreement in many ways, including without limitation: (i) not adhering to the terms of the Exclusivity Agreement, and in particular the provision allowing for Stuc-O-Flex to have exclusive marketing and distribution rights in the United States and Canada for the Products; (ii) competing with Stuc-O-Flex in the business of selling items similar to the Products and selling the Products to Stuc-O-Flex's competitors in the United States and Canada without consent or compensation; (iii) not allowing Stuc-O-Flex to inspect the Products, to ensure that they are of the highest quality for public consumers, and to enhance the reputation of Stuc-O-Flex as required under the Exclusivity Agreement; and (iv) selling Stuc-O-Flex's Trade-Name-marked Products without its consent and infringing on the company's trademark rights in violation of paragraph 12 of the Exclusivity Agreement.

43.     As a direct and proximate result of the wrongful actions and inactions of the Manufacturing Defendants, Stuc-O-Flex alleges upon information and belief that it has been damaged in at least the sum of $12,000,000.00, with the exact amount to be proven at time of trial.  Stuc-O-Flex also alleges that the Manufacturing Defendants, and in particular L&B and Walflor, must perform under the Exclusivity Agreement and adhere to the exclusivity arrangement contained therein.

44.     In addition, paragraph 24 of the Exclusivity Agreement entitled Stuc-O-Flex to reasonable attorneys' fees and costs upon prevailing in this action against the Manufacturing Defendants.

/ / /

11

COMPLAINT

## SECOND CAUSE OF ACTION

**(For Tortious Interference with Business Expectancy Against All Defendants, Including DOES 1-20)**

45.     Stuc-O-Flex repeats and incorporates by reference into this cause of action the allegations set forth above as though fully set forth in this cause of action.

46.     At all relevant times, Stuc-O-Flex had a business relationship and expectancy with Defendants with a high probability of future economic benefit for Stuc-O-Flex.  Indeed, Stuc-O-Flex invested significant sums of money in the original business relationship with Ural and WR, as well as in protecting rights of the Products via the '011 Patent, and expected an exclusivity arrangement in the United States and Canada as a result.

47.     Stuc-O-Flex also had a business expectancy that it would be able to distribute and sell the Products in those territories to third parties unconstrained, be able to consent to and be compensated for the Products sold to its third-party competitors, and be able to retain control over the inspection and quality of the Products to promote its reputation and business.  This would, clearly, result in significant profits in distribution and sale of the Products in those territories and in the high-quality reputation of Stuc-O-Flex.

48.     In acting or failing to act as described above, Stuc-O-Flex alleges upon information and belief that Defendants knew of the above business relationships and business expectancies.  Stuc-O-Flex further alleges that Defendants intentionally engaged in the conduct described above and induced and/or caused the termination of these business relationships and expectancies for Stuc-O-Flex.

49.     Stuc-O-Flex alleges that Defendants' interference was for an improper purpose and by improper means as described above.  Specifically, Defendants engaged in the above-discussed wrongful conduct by conspiring to wrongfully sell and acquire each Manufacturing Defendant so as to side-step the obligations under the Exclusivity Agreement and/or without complying with same in the transitions, to alter Stuc-O-Flex's relationships with its competitors and customers in the United States and Canada, to sell the Products and increase their profits and salary without constraint of any exclusivity relationship with Stuc-O-Flex, to improve their stature in the business community and

1 | impress their shareholders, and to manufacture lower-quality Products without inspection or consent to
2 | increase profits.

3 |       50.     As a direct and proximate result of the wrongful actions and inactions of Defendants,
4 | Stuc-O-Flex alleges upon information and belief that it has been damaged in at least the sum of
5 | $12,000,000.00, with the exact amount to be proven at time of trial.

6 | **THIRD CAUSE OF ACTION**

7 | **(For Trade Name Infringement Against All Defendants, Including DOES 1-20)**

8 |       51.     Stuc-O-Flex repeats and incorporates by reference into this cause of action the
9 | allegations set forth above as though fully set forth in this cause of action.

10 |       52.     In acting or failing to act as described above, Defendants have engaged in trademark
11 | infringement of Stuc-O-Flex's Trade Names by selling the marked Products to third-parties without
12 | Stuc-O-Flex's consent. Stuc-O-Flex has valid and protectable Trade Names in the industry that are
13 | associated with its Rainscreen products. Defendants' acts are willful and deliberate and committed
14 | with knowledge that Defendants' unauthorized use of Stuc-O-Flex's Trade Names causes a likelihood
15 | of confusion in the industry.

16 |       53.     Upon information and belief, Defendants derived and received, and will continue to
17 | derive and receive, gains, profits, and advantages from the above-described acts of infringement in an
18 | amount not presently known to Stuc-O-Flex. Stuc-O-Flex has been damaged as a result of Defendants'
19 | infringing conduct and is entitled to monetary relief in an amount to be determined at trial.

20 |       54.     Stuc-O-Flex will also continue to suffer severe and irreparable harm for which Stuc-O-
21 | Flex has no adequate remedy at law. As a result, Stuc-O-Flex seeks a permanent injunction from this
22 | Court prohibiting Defendants from infringing on Stuc-O-Flex's valid and protected Trade Names
23 | without its consent.

24 |
25 | ///
26 | ///
27 | ///
28 |

13
COMPLAINT

## FOURTH CAUSE OF ACTION

**(For Violation of Consumer Protection Act [RCW § 19.86.020 et seq.] Against All Defendants, Including DOES 1-20)**

55.     Stuc-O-Flex repeats and incorporates by reference into this cause of action the allegations set forth above as though fully set forth in this cause of action.

56.     In acting or failing to act as described above, Stuc-O-Flex alleges upon information and belief that Defendants engaged in a violation of the Consumer Protection Act under the Revised Code of Washington ("RCW") section 19.86.020 et seq.  These unfair business practices include all of the above-described wrongful conduct, including the conduct that constitutes a breach of the Exclusivity Agreement and the infringement on Stuc-O-Flex's valid and protected Trade Names.

57.     These practices occurred in the conduct of Defendants' trade or commerce and affected the public interest.  Indeed, in engaging in the wrongful conduct described above, Defendants, and in particular L&B and Walflor, have been manufacturing lower-quality marked Products, with poor material, without Stuc-O-Flex's inspection or consent.  Stuc-O-Flex alleges that this conduct negatively affects ultimate end-users of the Products as the Products are less effective to prevent water accumulation, along with their other uses.  This is, of course, in addition to the wrongful conduct that affected and damaged Stuc-O-Flex specifically.

58.     As a direct and proximate result of the wrongful actions and inactions of Defendants, Stuc-O-Flex alleges upon information and belief that it has been damaged in at least the sum of $12,000,000.00, with the exact amount to be proven at time of trial.

59.     Stuc-O-Flex is entitled to injunctive relief to enjoin Defendants from continuing these unfair business practices, as well as for treble damages and attorneys' fees and costs under RCW section 19.86.090.

WHEREFORE, Stuc-O-Flex prays for relief as follows:

1.     For general, special, compensatory, and/or consequential damages and lost profits in at least the sum of $12,000,000.00, with the exact amount to be proven at time of trial;

COMPLAINT

2.      For pre-judgment interest at the maximum legal rate in an amount to be proven at time of trial;

3.      For treble damages in an amount not to exceed $25,000.00 pursuant to RCW section 19.86.090;

4.      For a declaration that the Manufacturing Defendants are obligated to: (i) adhere to the terms of the Exclusivity Agreement, and in particular the provision allowing for Stuc-O-Flex to have exclusive marketing and distribution rights in the United States and Canada for the Products; (ii) not compete with Stuc-O-Flex in the business of selling items similar to the Products; and (iii) allow Stuc-O-Flex to inspect the Products, to ensure that they are of the highest quality for public consumers, and to enhance the reputation of Stuc-O-Flex as required under the Exclusivity Agreement; and (iv) not sell Stuc-O-Flex's Trade-Name-marked Products without Stuc-O-Flex's consent or infringe on the company's Trade Name rights either generally or in violation of paragraph 12 of the Exclusivity Agreement, should it apply.

5.      For an order of specific performance by the Manufacturing Defendants under the terms of the Exclusivity Agreement;

6.      For an order of injunctive relief for the Manufacturing Defendants to stop interfering with Stuc-O-Flex's customers and/or prohibiting Defendants from infringing on Stuc-O-Flex's valid and protected Trade Names without its consent;

7.      For attorneys' fees and costs pursuant to paragraph 24 of the Exclusivity Agreement and RCW section 19.86.090; and

8.      For such other relief as the Court deems just and proper.

Dated:  November 29, 2017                 KUSHNER CARLSON, PC

/s/

By: _____
           DOMINIC M. CARUCCI
           Attorney for Plaintiff

# EXHIBIT "A"



US007807011B2

(12) **United States Patent**　　(10) Patent No.: **US 7,807,011 B2**
Dunstan et al.　　(45) Date of Patent: **Oct. 5, 2010**

(54) **MULTILAYER LAMINATE SYSTEM AND METHOD USED WITHIN BUILDING STRUCTURES**

(75) Inventors: **Richard C. Dunstan**, Redmond, WA (US); **Daniel James Johnson**, Duvall, WA (US)

(73) Assignee: **Stuc-O-Flex International, Inc.**, Redmond, WA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/773,915**

(22) Filed: **Jul. 5, 2007**

(65) **Prior Publication Data**

US 2009/0007508 A1    Jan. 8, 2009

(51) **Int. Cl.**
*B32B 37/00*    (2006.01)

(52) **U.S. Cl.** ..................... 156/308.2; 442/398; 428/138

(58) **Field of Classification Search** ................ 52/169.5, 52/309.1, 302.1, 302.3; 442/370, 372, 398; 428/137, 138; 156/71, 308.2, 308.4, 308.6, 156/308.8

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,654,765 | A * | 4/1972 | Healy et al. ................... 405/45 |
| 4,425,396 | A * | 1/1984 | Hartman ..................... 428/220 |
| 4,593,511 | A * | 6/1986 | Hakasaari .................. 52/404.4 |
| 4,733,989 | A * | 3/1988 | Harriett .................... 405/43 |
| 4,923,331 | A * | 5/1990 | Kreikemeier ............... 405/45 |
| 5,102,260 | A * | 4/1992 | Horvath et al. ............. 405/50 |
| 5,560,974 | A * | 10/1996 | Langley ................... 428/198 |
| 5,598,673 | A * | 2/1997 | Atkins .................... 52/302.1 |
| 5,860,259 | A * | 1/1999 | Laska ..................... 52/302.3 |

| | | | |
|---|---|---|---|
| 6,401,401 | B1 | 6/2002 | Williams ...................... 52/58 |
| 6,594,965 | B2 | 7/2003 | Coulton ................... 52/302.1 |
| 6,804,922 | B1 * | 10/2004 | Egan ......................... 52/408 |
| 6,807,778 | B2 | 10/2004 | Engebretson ........... 52/204.59 |
| 2003/0126810 | A1 * | 7/2003 | Brunson et al. ........... 52/169.5 |
| 2006/0211321 | A1 * | 9/2006 | Lubker ................... 442/208 |

OTHER PUBLICATIONS

"Rainscreens control moisture: Rain Drain," BUILDERnews Magazine, Dec. 2004, pp. 42-43, available from http://www.buildernewsmag.com.
"STYROFOAM™ WEATHERMATE™ Plus Housewrap," The Dow Chemical Company, Product Information, Form No. 179-07168-0206P&M, McKay 190833-0407, available from http://www.dow.com/PublishedLiterature/dh_006a/0901b8038006a1b3.pdf?filepath=styrofoam/    pdfs/noreg/179-07173.pdf &fromPage=GetDoc.
"Weather-Resistive Barriers: How to select and install housewrap and other types of weather-resistive barriers," U.S. Department of Energy, Technology Fact Sheet, Oct. 2000, DOE/GO-102000-0769, available from http://www.eere.energy.gov/buildings/info/documents/pdfs/28600.pdf.

* cited by examiner

*Primary Examiner*—Brian E Glessner
*Assistant Examiner*—Adriana Figueroa
(74) *Attorney, Agent, or Firm*—Dorsey & Whitney LLP

(57)    **ABSTRACT**

Trapped moisture in the walls of a building structure may result in the building materials prematurely deteriorating unless there is a way for the moisture to escape. A rainscreen drainage mat provides an open cavity for the trapped moisture to escape by evaporation or gravity by draining the moisture out of the wall cavity. The multilayer laminate system includes a weather resistive barrier, drainage mat, and facer material as one application to be used within building structures to prevent moisture damage. In addition, the multilayer laminate system and method is configured to create a water resistive envelope at building material interfaces.

**6 Claims, 4 Drawing Sheets**





**Fig. 1**



Fig. 2A

Fig. 2B

Fig. 2C



**Fig. 3**



**Fig. 4**

US 7,807,011 B2

# MULTILAYER LAMINATE SYSTEM AND METHOD USED WITHIN BUILDING STRUCTURES

## TECHNICAL FIELD

This invention is directed toward preventing water or moisture damage within the walls of building structures, and more particularly this invention relates to a multilayer laminate system used in the walls of building structures to provide a breathable water proofing surface and drainage passage for moisture.

## BACKGROUND OF THE INVENTION

The accumulation of water within the walls of building structures may cause the building structure to prematurely deteriorate. Water may penetrate through the exterior building material causing the building materials to, for example, mold, mildew or rot. In addition, the walls of a building structure are particularly susceptible to water invasion where they interface with, for example, windows, doors, cracks, adjacent roofs or electrical boxes. Therefore, the moisture needs a way to escape or evaporate before penetrating the material of the inner wall of a building structure.

In order to prevent the accumulation of water or moisture, many materials have been used to separate an inner sheathing material from an outer building cladding of a building structure. For example, corrugated foam has been used as a separator by attaching it to the inner sheathing material with an adhesive. However, this process does not provide a path for the moisture to escape. For example, the adhesive or glue during installation causes the grooves to become clogged, thus, blocking the water's path to escape through the grooves. In addition, because the foam is installed in vertical tiers on the inner sheathing material, the grooves from an upper tier may not be aligned with the grooves of a lower tier. When the grooves from separate tiers are not aligned, the water may not be able to drain properly. Furthermore, grooved foam presents a potential for residual moisture entrapment where the foam surface touches the wall due to surface tension of the water resting on the surface of the foam causing absorption of water into the foam resulting in elevated moisture levels on the surface of the substrate.

As a result of the issues associated with using foam, weather resistive barriers, also known as house wraps, are currently being used. In fact, recent code changes now require a weather resistant barrier to separate the outer building cladding from the inner sheathing material. Such a weather resistant barrier should be waterproof, but still breathable. One weather resistant material commonly used today is Tyvek®, a registered trademark of the DuPont Company. Tyvek is a synthetic material that lets water vapor escape without allowing liquid water to enter. Although Tyvek is a weather resistant material, it fails to provide separation from the outer building cladding. Corrugated Tyvek has been used to create some separation, however, it fails to provide an adequate drainage mechanism for the trapped moisture to escape because as gravity pulls water down through the Tyvek, capillary action causes the water to get "caught" in locations where the corrugated Tyvek is touching the sheathing material. This prevents much of the water from escaping the inner walls of the building structure.

To provide drainage for the trapped moisture, rainscreen drainage mats have been installed between a weather resistive barrier and the outer building cladding. An example of a rainscreen drainage mat is Enkamat® sold by Colbond Inc.

To improve installation time, rainscreen drainage mats have been bonded to an all weather resistive barrier, such as tar paper or Tyvek. Therefore, a single application can be installed on the sheathing material of the building. A facer material, such as a filter fabric, is typically installed on top of the drainage mat before the outer building cladding is installed. However, the installation of the facer material on top of the drainage mat results in a two step process. Not only does the two step process increase installation time, but it also results in the use of more fasteners that may allow water penetration into the wall.

Another concern associated with the current weather resistive barriers and drainage mat combinations is that they do not adequately prevent water from entering interfaces between dissimilar building materials, such as the interface where the window or door meets the outer building cladding. Although flashing is used to resolve this issue, it is often improperly installed resulting in water entering at the interface. In addition, flashing does not provide a seal at the interface that is capable of keeping the water out.

Therefore, there is a need for a drainage system that includes all three layers, a weather resistive barrier, a drainage mat, and a facer material, for a faster and easier single unit installation process. Likewise, there is a need for a breathable water resistant sheathing material and drainage system that can prevent water damage by creating a seal around the interface.

## SUMMARY OF THE INVENTION

The present invention is directed toward a multi layer laminate drainage system, and a method for making same, for preventing moisture damage within the walls of building structures. In one aspect of the invention, the multilayer laminate drainage system includes a facer material, a drainage mat, and a weather resistive barrier (WRB).

In another aspect of the invention, the method for making the multilayer laminate drainage system includes laminating a weather resistive barrier to a drainage mat at approximately the same time as laminating the drainage mat to a filter fabric. Alternatively, the method for making the multilayer laminate drainage system includes bonding an all weather resistive barrier to a first drainage mat, bonding a facer material to a second drainage mat and bonding the first drainage mat to the second drainage mat.

Another aspect of the invention includes a method for installing a laminate drainage assembly at an interface of a building structure. The method includes separating a portion of a weather resistive barrier from a porous material and installing a building material between the separated weather resistive barrier and the porous material.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a cross sectional view of one embodiment of a multilayer laminate drainage system according to the present invention.

FIG. 2A is a cross sectional view of one embodiment of a facing surface laminated to a drainage mat according to the present invention.

FIG. 2B is a cross sectional view of one embodiment of an all weather resistive barrier laminated to a drainage mat according to the present invention.

FIG. 2C is a cross sectional view of one embodiment of the multilayer laminate drainage system formed from combining the structure of FIG. 2A with the structure of FIG. 2B according to the present invention.

3

FIG. 3 is a cross sectional view of one embodiment of the multilayer laminate drainage system installed in a building structure according to the present invention.

FIG. 4 is a cross sectional view of one embodiment of the multilayer laminate drainage system installed in a building structure around a window frame according to the present invention.

DETAILED DESCRIPTION

Embodiments of the present invention are directed toward providing a multilayer laminate drainage system and method of making and installing for use in building structures. Certain details are set forth below to provide a sufficient understanding of the invention. However, it will be clear to one skilled in the art that the invention may be practiced without these particular details.

A multilayer laminate drainage system **100** according to one embodiment of the invention is shown in FIG. **1**. The system **100** includes a facer material **140**, a rainscreen drainage mat **130**, and an all weather resistive barrier **120**, where the facer material **140** is laminated to the drainage mat **130**, and the drainage mat **130** is laminated to the all weather resistive barrier **120**. The facer material **140** provides a surface for applying the outer building cladding, such as stucco, stone, wood siding, masonry, etc. The lamination process typically involves heat and/or pressure and may include an adhesive. However, other laminating processes may be used. The multilayer laminate drainage system **100** provides a single assembly to be installed on building structures to provide a drainage for water or moisture as well as a weather resistant barrier to protect sheathing materials.

The facer material **140** is typically comprised of a breathable filter fabric capable of protecting the drainage cavity, such as polypropylene, polyolefin, polyethylene or other materials. The facer material **140** is typically attached to the drainage mat **130** by heat lamination. However, other types of attachment may be used. The facer material **140** is configured to protect the cavity of the rainscreen drainage mat **130** by separating the cavity from the outer building materials such as, for example, building panels, aluminum or vinyl siding or stucco. This separation allows the cavity to remain open for water and moisture to evaporate or descend under the force of gravity through the walls to a suitable drain. The facer material **140** is particularly useful for supporting an outer building material, such as stucco, manufactured stone, fiber-cement sidings, cedar shakes or siding, "EIFS" exterior insulation & finish systems, wood based siding materials, metal panels, brick, natural stone, and ensures that the drainage mat remains open and clear of the outer building panel.

The drainage mat **130** typically consists of an extruded polymer or nylon matrix of tangled monofilaments **131**. The overall shape of the drainage mat **130** may be corrugated with alternating ridges and grooves or randomized. The tangled monofilaments **131** create a mat that has a relatively large thickness compared to that of the facer material **140**. This thickness is primarily comprised of open space **133** within the drainage mat **130**. The open space **133** creates a cavity for drainage and ventilation so that moisture is able to escape by descending to an exit or by evaporating.

Just as one side of the drainage mat **130** is attached to the facer material **140**, the other side of the mat **130** is attached to the all weather resistive barrier **120**. This attachment may be made by heat lamination. Other attachment methods, however, may be used for attaching the mat **130** to the all weather resistive barrier **120**. In one embodiment, the all weather resistive barrier **120** is a code compliant weather resistive

4

barrier. A code compliant weather resistive barrier is a barrier having a minimum average water resistance of 16 hours and a maximum average water vapor transmission of 6 grams per square meters per 24 hours. In another embodiment the all weather resistive barrier **120** qualifies as a code compliant air infiltration barrier. The all weather resistive barrier **120** may be polyolefin, polypropylene, polyethylene or the like; however, other materials may be used. For example, the weather resistive barrier **120** may be made from STYROFOAM™ WEATHERMATE™ Plus housewrap sold by The Dow Chemical Company. The all weather resistive barrier **120** may be either woven or non-woven. Similarly, the all weather resistive barrier **120** may be perforated or non-perforated. In one embodiment, the all weather resistive barrier **120** is non-woven and non-perforated, thus allowing water vapor to escape while helping to prevent liquid from entering. In another embodiment, the all weather resistive based barrier **120** may be translucent, which assists builders in being able to identify studs and sheathing material.

One method of making the multilayer laminate drainage system **100** shown in FIG. **1** comprises laminating three layers in one step, where the three layers consist of a weather resistive barrier **120**, a drainage mat **130**, and a facer material **140**. Laminating in one step is accomplished by bonding the second side of the weather resistive barrier **120** with the first side of a drainage mat **130**, and at approximately the same time bonding the second side of the drainage mat **130** with a first side of a facer material **140**.

Another method of making a multilayer laminate drainage system **101** is shown in FIGS. 2A, 2B, and 2C. FIG. 2A shows a first drainage mat **130a** laminated to a facer material **140**. FIG. 2B shows a second drainage mat **130b** laminated to a weather resistive barrier **120**. FIG. 2C shows the structures of FIG. 2A and FIG. 2B laminated together resulting in a laminate of a facer material **140**, a first drainage mat **130a**, a second drainage mat **130b**, and a weather resistive barrier **120**.

The multilayer laminate drainage systems **100** and **101** created from either of the processes described above result in a product that allows an installer or construction worker to apply a weather resistive barrier, rainscreen drainage mat, and facer material assembly in a single application. Because it can be installed in a single application, using the multilayer laminate results in a shorter installation time. Installation may include attaching the multilayer laminate system to a sheathing material of a building structure and then attaching the outer building cladding to the facer material of the multilayer laminate system.

FIG. 3 is a cross sectional view of a multilayer laminate drainage system **100** installed in a building structure according to one embodiment of the invention. The weather resistive barrier **120** has a first side **122** and a second side **124**. Similarly, the drainage mat **130** and the facer material **140** have a first side **132**, **142** and a second side **134**, **144**, respectively. The second side **124** of the resistive barrier **120** is laminated to the first side **132** of the drainage mat **130**. The second side **134** of the drainage mat **130** is laminated to the first side **142** of the facer material **140**.

In one embodiment, the multilayer laminate drainage system **100** is attached to the wall sheathing material **110** by fasteners. The fasteners go through the facing material **140**, the drainage mat **130**, and the weather resistive barrier **120** and attach to the sheathing material **110**. The lowest layer of the drainage system **100** is attached to the sheathing material **110** first and then a second layer overlaps the top of the first layer so that descending water does not run between the walls. The second side **144** of the facing material **140** is exposed and

US 7,807,011 B2

5

configured to receive the outer building cladding 150. The facing material 140 protects the cavity of the drainage mat 132 by preventing the outer building cladding 150 from intruding into the cavity. In addition, the facing material 140 provides the function of mechanical reinforcement of the siding materials, resulting in a stronger wall. Because the facing material 140 is a relatively solid surface as compared to the drainage mat 130, the facing surface 140 distributes point loading, which results in a flatter exterior building wall 150.

FIG. 4 is a cross section view of a building structure 105 with a through wall penetration where a window 160 including a window frame 162 is installed. The point at which the window 160 and window frame 162 meet the outer building cladding 150 creates an interface 107. Any object or building material dissimilar from the outer building cladding 150 creates an interface 107 created by dissimilar materials often results in voids that allow water or moisture to enter within the building structure walls causing damage. Typically, flashing techniques have been used to prevent water from entering at interfaces 107. However, even when flashing is used, there is still a significant risk of water entering the building structure.

In one embodiment, a drainage system 100 is attached to the entire building structure, including the wall sheathing material 110 and all through wall penetrations. The facer material 140 and the drainage mat 130 are removed from the weather resistive barrier 120 at the through wall penetrations without compromising the integrity of the barrier 120. The facer material 140 and the drainage mat 130, however, provide some overhang around the perimeter of the through wall penetration. The barrier 120 is then cut within the through wall penetration in a manner so that the barrier 120 may be folded in to the opening. A person having ordinary skill in the art would be familiar with the type of cut used so in the interest of brevity, a further explanation of the cut will be omitted. The overhang of the facer material 140 and drainage mat 130 around the perimeter of the through wall penetration is pulled back from the barrier 120, again, without compromising the integrity of the barrier 120. A window frame, or any other object to be installed in the through wall penetration, is placed between the folded in barrier 120 and the drainage mat 130, so that the barrier 120 and the drainage mat 130 are sandwiching the window frame 162. The barrier 120 is sealed around the inside perimeter of the window frame 162, and the drainage mat 130 is sealed around the outside perimeter of the window frame 162. This seal prevents water from leaking into the interior walls of the building structure at the interface 107 where the window 160 and building material meet.

In another embodiment, the drainage system 100 works in conjunction with traditional flashing material to create a weather resistive seal around a through wall penetration. In this embodiment, flashing material is installed around the perimeter of the through wall penetration so that the flashing material extends past the perimeter of the through wall. Typically, the flashing material extends about 9 inches beyond the perimeter of the through wall penetration, however, other lengths may be used. In one embodiment, the drainage system 100 covers the entire through wall penetration and then is cut out with an overhang around the perimeter of the through wall penetration. In another embodiment, the drainage system 100 is installed to overhang the perimeter of the through wall penetration. The weather resistive barrier 120 is then separated from the drainage mat 130 while maintaining the struc-

6

tural integrity of each component of the drainage system 100. The window frame is placed within the through wall penetration so that the flashing material is surrounding the perimeter of the outside surface of the window frame, and the drainage mat 130 is against the flashing material. In addition, the barrier 120 is surrounding the perimeter of the inside surface of the window frame. A seal is created around the inside and outside surfaces. The seal, in conjunction with flashing, results in a water resistive envelope that can more adequately prevent water from entering between the walls of a building structure. This configuration is applied to the entire perimeter of the window 160 creating a water resistive envelope around the entire window. Thus, the weather resistive barrier 120 is sealed around the entire window protecting the inner sheathing material 110 from moisture or water.

Not only does the drainage system create a better seal around through wall penetrations, but it improves the installation process. Because the three layers are installed at one time, the time for installation is decreased. In addition, because it does not require the overlapping layers to be aligned, it is easy to install.

Although the present invention has been described with reference to the disclosed embodiments, persons skilled in the art will recognize that changes may be made in form and detail without departing from the spirit and scope of the invention. Such modifications are well within the skill of those ordinarily skilled in the art. Accordingly, the invention is not limited except as by the appended claims.

We claim:

1. A method of making a multilayer drainage assembly, comprising:

heat bonding a first matrix of tangled monofilaments comprising substantial void space and permitting liquid drainage to a first surface of a moisture resistive barrier; and

heat bonding a second matrix of tangled monofilaments comprising substantial void space and permitting liquid drainage to a first surface of a filter fabric;

adhering a first surface of the first matrix of tangled monofilaments to a first surface of the second matrix of tangled monofilaments, the first matrix of tangled monofilaments, the second matrix of tangled monofilaments, the moisture resistive barrier, and the filter fabric forming an assembly configured to be applied to an outer surface of a building structure as a single assembly.

2. The method of claim 1 wherein the moisture resistive barrier comprises at least one of polyolefin, polypropylene, and polyethylene.

3. The method of claim 1 wherein the filter fabric comprises at least one of polyolefin, polypropylene, and polyethylene.

4. The method of claim 1 wherein the first and second matrix of tangled monofilaments comprises at least one of a polymer or nylon matrix.

5. The method of claim 1 wherein the moisture resistive barrier comprises at least one of a translucent moisture resistive barrier, a non-perforated moisture resistive barrier, a perforated moisture resistive barrier, a non-woven moisture resistive barrier, or a woven weather resistive barrier.

6. The method of claim 1 wherein the first and second matrix of tangled monofilaments comprises at least one of extruded polymer or extruded nylon.

*   *   *   *   *

**EXHIBIT "B"**

## DISTRIBUTORSHIP AGREEMENT

This Agreement by and between STUC-O-FLEX INTERNATIONAL, INC. (hereinafter called " Distributor "), a Washington corporation, and WATERWAY RAINSCREEN LLC and/or Mr. John Ural (hereinafter called "Supplier"), a Washington corporation, is made on this 5th day of November, 2012.

R E C I T A L S:

A. Supplier is in the business of Manufacturing Rainscreen & Ventilation Mats, and related products and goods (all hereinafter called "products and goods").

B. Distributor is in the business of purchasing construction products at wholesale and reselling the same to the building materials industry.

C. Supplier desires to contract with Distributor to distribute its manufactured products within a certain territory.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the parties hereto agree as follows:

1. Appointment: Supplier hereby appoints Distributor, and Distributor accepts such appointment, to distribute Supplier's manufactured products on the terms and conditions as hereinafter set forth. The parties hereby agree to be bound by and to act and perform in accordance with the terms and conditions of this Agreement.

2. Territory: Supplier hereby authorizes Distributor to act as Supplier's Exclusive Master Distributor in the United States and Canada, (hereinafter the "Territory") with respect to all Supplier's manufactured products and goods. Excluding all products Manufactured / Marketed for "Sound Control" applications.  Distributor agrees to not to market, sell or make any claim on sound control mats. It is further agreed by the parties, the products shall not be sold, labeled, marketed or offered for interior sound control applications.

In the event a Stuc-O-Flex competitor (Dryvit, Sto, Senergy, Parex, Omega, Etc..) has interest in purchasing the products, but is unwilling to order from Stuc-O-Flex International, Upon written agreement  between the parties (Supplier and Distributor) Supplier may sell direct to Stuc-O-Flex competitors and compensate Distributor at $00.02 a sq. ft.

3. Product Description: Distributor shall initially distribute the following Products of Supplier and any such further Products. The initial Products to be sold by Distributor are as follows:

Description: Rainscreen & Ventilation Mats

Mats consisting of an extruded polymer matrix of tangled monofilaments. The monofilaments are sometimes laminated to a moisture resistant filter fabric with high perm rating on the outer side.

· 1

All products and goods supplied by the Supplier to the Distributor are to be manufactured in Monroe, Washington. The Supplier will not supply to the Distributor material not manufactured in Monroe, WA. without written acceptance by the Distributor prior to shipment.

4. Price, Payment of Price:

(a) Price. The current prices for the products are listed below and by this reference fully incorporated herein. Supplier may revise prices to Distributor, after giving Ninety (90) Days notification.

PRICE:    $00.23 Per Sq. Ft. (USD) Rainscreen with filter fabric /3mm

$00.26 Per Sq. Ft. (USD) Rainscreen with filter fabric / 7mm & 11mm

$00.20 per Sq. Ft. (USD) Rainscreen mats without filter fabric

$00.28 Per Sq. Ft. (USD) Rainscreen laminated to Vapro-Shield

7mm & 11mm / (Client to supply Vapro-Shield Fabrics)

Maximum annual price increase shall not exceed 3 % per year.

(b) Initial Inventory of Product. Distributor will purchase an initial truckload of the Products

(c) Freight Charges. Distributor shall arrange transportation for each order placed with Supplier. Supplier agrees to load all containers, trucks, trailers and will call orders at the Monroe, WA location.

(d) Payment of Purchase Price. Distributor shall pay in full, on a Net 30 - thirty (30) day basis, all of Supplier's invoices for products pursuant to Distributor's orders. Supplier may refuse to sell products to Distributor at any time that Supplier is not current with these agreed upon terms.

(e) When supplier provides product delivered to distributor's specified location, Distributor agrees to pay in full for those products delivered within 10 days on the delivery date.

Duties of Distributor. Distributor covenants and agrees as follows:

(a) To sell and promote the sale of Supplier's manufactured product covered by this Agreement in accordance with the terms and conditions of this Agreement.

(b) To comply with all the terms, covenants and conditions of this Agreement.

(c) To take only such actions which enhance the reputation of Supplier.

(d) To train and maintain a sales organization to sell Products within the territory and in accordance with the terms and conditions of this Agreement.

2

(e) To maintain within the Territory an inventory of the Products and adequate storage or warehouse facilities therefore.

(f) To establish and maintain an adequate business office, equipped and other reasonably necessary office equipment, supplies and personnel.

5. Supplier's Responsibilities. Supplier shall perform the following services:

(a) Supplier understands and agrees that WaterWay Rainscreen is a Trademark of Distributor and further agrees to immediately change the company WaterWay Rainscreen LLC to a different name not infringing on distributor's trademarks. The selected name must prevent confusion in the market place with respect to distributor's trademarked products.

(b) Supplier will exert reasonable efforts to supply the needs of the Distributor for the Product to meet the demands within the Territory, but reserves the right reduce, combine or otherwise reasonably modify orders upon acceptance thereof and to allocate its Products among its customers to accommodate its production schedules and to deal with scarcity of supply;

(c) Supplier agrees to provide Products to Distributor of a quality as represented by Supplier submitted samples / specifications (agreed upon by the parties) for each product Distributor will market.

(d) Supplier will not supply material stipulated in item 3 above, or any other extruded polymer matrix of tangled monofilament products that may be agreed on in the future, into the described Territory, either under the trade name described therein, or any exact or similar product designated under any label, trade name or description.

(e) The Suppler will give Distributor the first right of refusal to the exclusivity in the territory for any and all new extruded polymer matrix of tangled monofilament products manufactured by the Supplier. Excluding all products Manufactured / Marketed for "Sound Control" applications.

(f) Supplier agrees to utilize its best efforts to purchase and pay for a minimum $750,000.00 worth of distributors manufactured products after signing the agreement.

6. Rebates. Supplier agrees to Rebate Distributor 3.0% of the total invoiced amount from dollar 1, if Distributor purchases and payments reach $900,000.00 in the form of Co-Op advertising credit and 5% from dollar 1 if Distributor purchases and payments exceed $1,300,000.00 in the calendar year. This Rebate will be provided in a credit for future purchases of the product outlined in the agreement.

7. Term.

(a) This Agreement shall remain in effect for a period of two (2) years from the date hereof, and thereafter it shall be extended automatically on a year to year basis subject to the termination

3

rights set forth within. It is further agreed if the supplier sells the company, this contract will remain in effect and purchasing party will be bound by the terms set forth in this agreement.

(b) Either party may cancel and terminate this Agreement by giving at least One Hundred and Eighty (180) days written notice thereof. Unless any of the following termination acts occur:

(c) The parties may cancel and terminate this Agreement by giving the other party fifteen (15) days' written notice if any of the following termination acts occur:

(i) If either party makes any assignment of assets of the business for the benefit of creditors other than in the normal course of business;

(ii) If a trustee or receiver is appointed to administer or conduct its business or affairs and is not discharged within sixty (60) days of appointment;

(iii) If it is adjudged in legal proceedings to be in either voluntary or involuntary bankruptcy; provided, however, if any of the proceedings are instituted in Chapter 11 of the U.S. Bankruptcy Code or any other federal or state laws whereby Distributor will be able to continue in business thereafter, this Agreement shall continue in effect;

(iv) Any act of fraud practiced by Distributor on Supplier, or any act of fraud practiced by the Supplier on the Distributor.

**Note:** Because Distributor has contractual obligations to some clients, Supplier agrees to continue to supply the products for a minimum 180 day period without delay or disruption.

8. Non-Competition. The Supplier acknowledges and agrees that the Distributor is engaged in a highly competitive business and that if the Supplier should engage in a business which is directly competitive with the business of Distributor, then the Distributor will incur irreparable harm. Therefore, the Supplier covenants and agrees that so long as the parties are contractually bound by this Agreement, and for a period of eighteen (18) months after the date of termination or expiration of this Agreement, the Supplier will not, directly or indirectly, within the territory sell (whether wholesale or retail), represent, distribute or commercially handle products and goods which are competitive with Distributors products and goods, without Distributor's written consent to do so, including the sale to any third party. The Supplier further agrees not to sell any of the Distributor's customers for a minimum 18 months after termination of this agreement, including any and all private label customer or customers introduced, offered, recommended or introduced to Supplier by the Distributor.

9. Risk of Loss / Insurance. The Distributor shall bear the risk of loss for all products and goods acquired from Supplier upon delivery to Distributor's warehouse. Supplier's responsibility ends with the pick-up of products and goods to Distributor. Claims for shortage or damage in transit must be made by Distributor within 24 hours of delivery to Distributor's designated location(s). The Distributor agrees to maintain fire and theft insurance covering the products.

4

10. Defective Products and Goods. The Distributor shall inspect all the products and goods promptly upon delivery. Any defect in the products and goods shall be reported to the Supplier within 24 hours after the Distributor or customer has, or should have had, knowledge thereof. The Supplier shall have the option of either replacing the products and goods which are found defective and which have been returned at the Supplier's expense, or refunding back to the Distributor the Supplier's invoice price for such products and goods. All losses resulting from failure to so report defective products and goods within such period provided above shall be borne by the Distributor, and all claims with respect to such losses are hereby waived.

11. Warranties. THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE DESCRIPTION ON THE FACE OF THE PRODUCT OR GOODS, IF ANY, AND THERE ARE NO PROMISES, AGREEMENTS, IMPLIED OR EXPRESSED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE OR MERCHANTABILITY OR UNDERSTANDING OTHER THAN SET FORTH ON THE FACE OF THE PRODUCT OR GOOD. All warranties, if any, run solely from manufacturer to end-user customer. This disclaimer and limitation on warranties has been exclusively bargained between the parties.

12. Trademark Protection. The Distributor is the owner of the trademarks and names and graphic designs (collectively "the Marks"), which identify the Products and which are valuable assets of the Distributor. It is vital to the business of the Distributor that the marks be associated only with the marketing methods of the highest quality and that the customer's acceptance and good will inherent in the marks be preserved and enhanced in the course of sales of the Products.

The Distributor hereby grants Supplier the right, as limited by this Agreement, to utilize the Marks to resell to the building trade in the Territory and Canada only such of the Products as are purchased by the Distributor from the Supplier. No right to transfer, encumber or sublicense any right with respect to any of the Marks is granted hereby, except that, only within the Territory, resale of the Products bearing the Marks to authorized retailers of the Products shall authorize such retailers to utilize the Marks to identify the Products in the course of their trade consisting solely of selling the Products within the Territory to consumers.

The Supplier will not repackage or combine with other goods any of the Products, or use the name or any trademark of the Distributor, in any advertising, public relations or promotions, without the Distributors prior expressed written consent. The Distributor will not unreasonably withhold its consent, except that the Distributor need not consent to any packaging, advertising or other use of any such name or trademark which in its sole judgment is illegal, in bad taste, or inconsistent with its marketing policies or objectives.

13. Resale Pricing. The prices charged and credit terms, if any, offered by the Distributor are within the sole discretion of Distributor.

14. Personal Services. Supplier and the person signing this Agreement on behalf of the Supplier agree that said person will personally manage the discharge of all duties of the Supplier hereunder, full time and on site, devoting his or her best personal efforts to the discharge of said duties in accordance with the letter and spirit of this Agreement and refraining from all activities which might detract from the rendition of such personal management. The Supplier represents, warrants

and covenants that the personal knowledge, skills and experience of said person are unique and valuable and will at all times hereunder be valuable to the Distributor for the purpose of carrying out the terms hereof. The provisions of this section are material inducement to the Distributor to enter into this Agreement and constitute valuable consideration bargained for by the Distributor in entering into this Agreement.

No duty of the Supplier hereunder may be delegated or assigned and no part of the Supplier hereunder may be sold, assigned, transferred or licensed in whole or in part in any manner whatsoever without the prior written consent of the Distributor. The Distributor will not in bad faith withhold its consent to delegation of duties or transfer of rights hereunder to a business successor of the Supplier, but may take into account any business factor in determining whether to grant consent and accord any such factors such weight as it may determine in its sole discretion.

15 Survival of Obligations. Termination of this Agreement, regardless of the reason, will not release either party from any liability that at the time of termination has already accrued to the other party or which thereafter may accrue in respect of any act or omissions prior to such termination.

16. Severability. If any provision of this Agreement is contrary, prohibited by or deemed invalid under applicable laws or regulations of any jurisdiction in which it is sought to be enforced, then such provision shall be deemed inapplicable and deemed omitted, but shall not invalidate the remaining provisions hereof.

17. Confidentiality. All trade secrets and confidential information Supplier or Distributor may obtain from the other pursuant to this Agreement shall be kept confidential and shall not be disclosed to any third party.

18. Notices. Any notice required or permitted hereunder shall be in writing and be served personally or sent by certified mail, return receipt requested, enclosing such notice in a postage paid envelope or sent by e-mail, telefax or cable, directed as follows:

Stuc-O-Flex International, Inc.
17639 N.E. 67th Court
Redmond, Washington 98052
ATTENTION: Dan Johnson, Technical Sales Manager

WaterWay Rainscreen LLC and/or Mr. John Ural
17675 147th Street SE
Monroe, WA 98272
ATTENTION: John Ural, President

Any notice or instruction, if served personally, shall be deemed to have been given on the date on which it was served. If transmitted by e-mail, telefax or cable, it shall be deemed to have been given at the opening of business in the office for the addressee on the next business day following its transmission, unless otherwise agreed in writing. If mailed, it shall be deemed to have been given on the second business day following its mailing. Either party may change its address for

notice from time to time by notice given to the other party in accordance with the notice procedures.

19. Descriptive Paragraph Headings. The descriptive paragraph headings in this Agreement are inserted for convenience only and references to this Agreement are not to be indicative of the content of any paragraph or subparagraph.

20. Benefit. This Agreement shall bind and inure to the benefit of each party, its successors and assigns.

21. Waiver. Failure of any party to insist in any one or more instances upon strict performance by the other of its obligations hereunder shall not constitute a waiver or relinquishment of any such obligation for the future, and the same shall continue in full force and effect.

22. Integration and Modification. This is the entire agreement between the parties. There are no other agreements or representations not set forth herein. This Agreement may not be modified except in writing and signed by each party.

23. Jurisdiction/Governing Law. If either party purses any legal action against the other party, it is acknowledge and agree that this Agreement shall be construed in accordance with the laws of King County in the State of Washington.

24. Attorney's Fees. In the event either party to this Agreement seeks the assistance of legal counsel to enforce or defend this Agreement or to maintain or defend any arbitration, action or other proceeding arising out of or related to this Agreement, then the prevailing party in any such action, demand, arbitration or defense shall be entitled to recover from the other party said prevailing party's reasonable attorneys' fees incurred, together with costs and expenses.

25. Representation As To Corporate Authority. All corporate parties hereto and individuals executing these documents on behalf of said corporations warrant that said corporations have corporate authority to enter into this Agreement and that the individual executing on behalf of each corporation has the authority to execute this Agreement on behalf of the respective corporation.

DATED this 28th day of June, 2013

DISTRIBUTOR:

STUC-O-FLEX INTERNATIONAL, INC.

By _____

Date: ___5 / 29 / 13___

Name: Dan Johnson

Title: Technical Sales Manager

SUPPLIER:

WaterWay Rainscreen LLC and/or Mr. John Ural

By _____

Date: ___5 / 29 / 2013___

Name: John Ural

Title: President

7